

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-1246-18

---

### LYDIA METCALF, Appellant

### v.

### THE STATE OF TEXAS

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SIXTH COURT OF APPEALS
### PANOLA COUNTY

---

**SLAUGHTER, J., filed a dissenting opinion in which YEARY, J., joined.**

### <u>DISSENTING OPINION</u>

Today the Court holds that a parent's willful ignorance of the sexual assault of her child cannot satisfy the element of "acting with intent to promote or assist" for party liability under Texas Penal Code § 7.02(a)(3). I disagree and respectfully dissent.

Appellant was convicted under a theory of party liability of the sexual assault of her daughter, Amber,[1] by Appellant's husband, Allen. *See* TEX. PENAL CODE § 7.02(a). Penal Code Section 7.02(a)(3) states that "[a] person is criminally responsible for an offense committed by the conduct of another if . . . having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, [s]he fails to make a reasonable effort to prevent commission of the offense." *Id*. § 7.02(a)(3).[2] No one disputes that Appellant had a legal duty to protect Amber from being sexually assaulted by Allen.[3] The sufficiency question in this case boils down to whether the jury could have rationally concluded that Appellant, while acting "with intent to promote or assist" the commission of "the offense," failed to make a reasonable effort to prevent Allen from sexually assaulting Amber. *Id.*

The Court's opinion questions, without deciding, whether the State had to prove that Appellant knew "the offense" was anal penetration as alleged in the indictment or whether it was instead sufficient to prove that she knew some type of sexual assault was occurring without requiring knowledge of the manner of penetration. *See* Maj. Op. at 15 & n.16. Ultimately, the Court holds that regardless of which type of knowledge must be shown, the evidence here was

---

[1]    Amber is the pseudonym assigned by the court of appeals to refer to the complainant in this case.

[2]    The jury also received the law of parties under Section 7.02(a)(2). That provision states that "[a] person is criminally responsible for an offense committed by the conduct of another if: acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" TEX. PENAL CODE § 7.02(a)(2). The State's arguments and this Court's analysis focus on the sufficiency of the evidence under the alternative theory of liability under Section 7.02(a)(3). I agree that the evidence is insufficient to support Appellant's conviction under Subsection (a)(2), and I therefore limit my analysis accordingly.

[3]    *See* TEX. FAM. CODE § 151.001(a)(2) (providing that a parent has a legal duty to protect his or her child). Appellant also had a legal duty to report the sexual abuse. *Id.* § 261.101(a) ("A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person" is required to report it.).

nevertheless legally insufficient to support the jury's finding that Appellant acted "with intent to promote or assist" the sexual assault because Appellant was unaware that Allen was sexually assaulting Amber at all. I address both of these issues and conclude that: (1) the State did not have to prove that Appellant knew the sexual assault was by anal penetration; and (2) the evidence was sufficient to prove that Appellant acted "with intent to promote or assist" the sexual assault because Appellant knew there was sexual activity between Allen and her daughter but she acted with intent to remain intentionally ignorant of the details while knowing the sexual activity would continue.

**I.     The State only needed to prove that Appellant knew Allen was perpetrating some type of sexual offense against Amber.**

Although the Court does not conclusively decide this issue, its opinion nevertheless raises the possibility that because the indictment alleges the sexual assault was caused by anal penetration, the State may have to prove that Appellant knew the sexual assault was by anal penetration, as opposed to penetration generally, to establish party liability. The Court should not adopt such a restrictive construction of Section 7.02(a)(3) that would limit the statute's effectiveness. *See* TEX. PENAL CODE § 1.05(a) ("The rule that a penal statute is to be strictly construed does not apply to this code. The provisions of this code shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the code."). As this Court has previously observed, "'Section 7.02(a)(3) makes one a party who aids the commission of the offense by inaction. Thus, a night watchman or policeman can be a party to an offense by purposely neglecting his duty, if he does so with intent to assist the perpetuating party.'" *Medrano v. State*, 612 S.W.2d 576, 578 (Tex. Crim. App. 1981) (quoting Practice Commentary). The purpose of this statute is to criminalize conduct by those who have "a legal duty to prevent the commission of an offense, [ ] have neglected that legal duty, and [ ] have done so with the intent

to promote, or to assist in promoting, the commission of an offense." *Id.*[4] Given that the focus of this statute is on the defendant's purposeful failure to act in spite of his legal duty to do so, and on his intent to promote or assist some offense in which he is not directly involved, it would make little sense under these circumstances to require proof that the defendant anticipated every detail surrounding the particular manner and means by which "the offense" would be committed. Accordingly, the proper understanding of the statute's reference to "the offense" is any offense committed by the primary actor that was foreseeable by the defendant and for which the defendant acted with the requisite intent to promote or assist through his or her inaction.

Section 7.02(a)(3) refers to the defendant's intent to promote or assist the commission of "the offense" in reference to "an offense committed by the conduct of another." The defendant need not know the specific offense that the primary actor perpetrates or the manner and means of perpetrating the offense so long as the defendant knows that the primary actor plans to commit "an offense;" the ultimate offense committed was foreseeable by the co-defendant; the co-defendant has a legal duty to prevent the offense actually committed; and the co-defendant, acting with intent to promote or assist the primary actor in committing the offense, fails to make a reasonable effort to prevent the commission of the offense.

For example, if the mother of a thirteen-year-old girl is told by her husband to leave the room so he can teach her daughter sex education by example and she knows he intends to commit at least indecency with a child if not more, she can be charged under Section 7.02(a)(3) for any foreseeable sexual offense he commits against her daughter, regardless of whether the mother knows the specific details or not. Under those circumstances, a jury could reasonably infer that the mother had the requisite intent to "promote or assist" any sexual offense through her inaction,

---

[4]    *See also Rasberry v. State*, 757 S.W.2d 885, 887 (Tex. App.—Beaumont 1988, pet. ref'd) ("Section 7.02(a)(3) is concerned with situations in which a person may be criminally responsible for the conduct of another by failing to act.").

even though she did not know the particular sexual offense that her husband would commit. Similarly, in Appellant's case, the evidence was sufficient to establish at the very least that Appellant knew her husband was committing a sexual offense against Amber. The State was not required to prove that Appellant intended to promote or assist the particular manner of penetration alleged in the indictment.[5]

### II. The evidence was sufficient to find that by Appellant's willful ignorance, she acted "with intent to promote or assist" Allen in sexually assaulting Amber.

The Court holds that the evidence was insufficient for a rational jury to find that Appellant "acted with intent to promote or assist" Allen in his sexual assault because there was no proof that Appellant knew about the assault. I disagree. The jury had sufficient evidence to make reasonable inferences that Appellant knew Allen was committing sexual offenses against her daughter but chose to remain willfully ignorant and willfully in denial about the details of the abuse to facilitate his commission of the offense.

The Legislature defines "conduct" as "an act *or omission* and its accompanying mental state." TEX. PENAL CODE § 1.07(a)(10) (emphasis added). "A person acts intentionally, or with intent, with respect to the nature of [her] conduct or to a result of [her] conduct when it is [her] conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a). Thus,

---

[5]  I recognize that we have held in other contexts that penetration of the anus and sexual organ under Penal Code Section 22.011(a)(1) technically constitute two different offenses. *See Jourdan v. State*, 428 S.W.3d 86, 96 (Tex. Crim. App. 2014) (discussing unanimity requirements); *Gonzales v. State*, 304 S.W.3d 838, 849 (Tex. Crim. App. 2010) (discussing double jeopardy). But it does not inexorably follow that we must interpret the phrase "the offense" as used in Section 7.02(a)(3) as referring to the particular type of penetration that actually occurred. By way of analogy, I note that at least one court of appeals has upheld a conviction for assault under Section 7.02(a)(3) where the assault alleged in the indictment included a manner and means that was unknown to the defendant at the time of the offense. *Rasberry*, 757 S.W.2d at 888 (indictment alleged assault by cutting with knife; evidence was sufficient to show that defendant "intended to promote or assist in an assault causing bodily injury," and this was true "regardless of there being no proof that he knew that [principal actor] had a knife.").

"acting with intent to promote or assist" can mean that a person knows a defendant is committing some kind of offense, but the person engages in willful ignorance of the details of the offense when such conduct reflects an intent to promote or assist the commission of the offense.

When we review the record for legal sufficiency, our duty is to view the facts in the light most favorable to the jury's verdict. *Jackson v. Virginia*, 443 U.S. 307, 319, 326 (1979). We must presume that the jury resolved conflicting inferences in favor of the prosecution, and we must defer to that resolution. *Matson v. State,* 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The jury, as the fact finder, is the sole judge of the weight of the evidence and the credibility of the witnesses. *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995) ("The jury is the sole judge of the weight of the evidence and may choose to believe all, some, or none of it.") It may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *Febus v. State,* 542 S.W.3d 568, 572 (Tex. Crim. App. 2018). A jury may not speculate about the meaning of facts or evidence, but it is permitted to draw any reasonable inference from that evidence so long as each inference is supported by the evidence adduced at trial. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018). "Furthermore, the trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence." *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014). Of particular relevance to this case, in looking at the issue of intent for party responsibility, "[t]he necessary specific intent can be proven through circumstantial evidence, and we may rely on events that took place before, during, or after the commission of the offense." *Cary v. State*, 507 S.W.3d 750, 758 (Tex. Crim. App. 2016).

With the scope of our review in mind, the record shows:

Amber is Appellant's child from her first marriage. When Amber was around eight years old, her mother started dating Allen Metcalf. Soon thereafter, Appellant, Amber, and Amber's

younger brother moved in with Allen. Within a year or two, Appellant and Allen got married, and they later had two children together, first Alyssa and then William.

The family moved to Houston, where they rented a three-bedroom apartment. Amber attended school in Houston for a year before her mother pulled her out of school when she was around twelve years old.[6] Amber testified that her mother homeschooled her for "maybe two months," and then the homeschooling stopped. At that time, Appellant was working as a nanny, and Amber took on the responsibilities of keeping the house clean (by washing dishes, doing laundry, etc.).

It was around this time period, after Amber turned thirteen, that Allen began molesting her. The molestation began with him coming into her room and touching her breasts under her clothing. This progressed to Allen touching Amber's vagina with his fingers and penis. Amber did not tell anyone about the abuse at that time because Allen "said he was going to hurt [her] brother and sister" if she told anyone. But Appellant admitted that even at this time, she had some awareness that something "strange" was going on after she observed Allen returning to bed around 2:30 a.m., explaining that he was "just checking on the kids."[7]

When Amber was about fourteen years old, the family returned to the four-bedroom house where they had previously lived in Carthage, Texas. In describing the sleep arrangements at this house, Amber stated that she had the bedroom "close to [the] door" of Allen and Appellant's

---

[6] Amber testified that her mother withdrew her from school to homeschool her because "they were putting [her] into the Special Ed class" due to a diagnosis of dyslexia. Testimony from Amber's aunt, Emma Blakeman, alternatively suggested that Appellant had pulled Amber out of school because Amber "had been molested on the bus at school." The jury could have construed these facts as suggesting that Amber needed an even higher level of protection from her mother.

[7] Although Appellant did not testify, this statement came into evidence through her written statement to police investigators that was admitted into evidence at trial.

bedroom, while her siblings slept in the other bedrooms down the hall. Amber did not return to school after moving to Carthage; instead, she continued to cook and clean for the family.

Amber testified that, while in Carthage, Allen came into her bedroom "every night," except when she was menstruating, to sexually abuse her.[8] Amber testified that Allen would touch her vagina with his hands and penis and at other times would anally rape her. When Amber asked him to stop and threatened to tell her mother, Allen again warned that Amber "better keep quiet or [her] siblings will get hurt."

Amber testified that it hurt when Allen anally raped her, and she would cry out. In the beginning, she would cry out for her mother, but her mother did not respond. Amber described an incident in which Allen was anally raping her in the master bedroom and she called out for her mother. Amber testified she did not know where her mother was at that time, but her mother never came to investigate. At one point, the prosecutor asked whether anyone ever came to check on Amber. Amber replied that once, her brother and sister heard her crying out and knocked on the door, but Allen told them to go away and watch a movie. Amber also indicated more generally that when she would cry out for her mother, sometimes Appellant would "stand by the door, waiting by the door to her room," and ask, "What's going on?" Allen gave the excuse that Amber was having a nightmare:

> Q:     Did you ever cry out for your mom when Allen came into your room?
>
> A:     Yes, I did.
>
> Q:     Did she ever come?
>
> A:     She didn't come, but she'd stand by the door, waiting by her door to her room.
>
> Q:     What did she say?

---

[8]     Amber testified that the abuse also sometimes occurred during the daytime.

A:     "What's going on?" He said I was having a nightmare, and he came out of my room and back to his room.

Amber's testimony suggested that this type of incident may have happened on more than one occasion. Ultimately, Amber stopped crying out for Appellant because, as she testified, "I knew my mother was letting it happen."

When Amber was fifteen, she spoke with Appellant about "what was going on" with Allen. The following exchange occurred on direct examination:

Q:     Did you ever tell your mom what was going on?

A:     Yes, I did, when I was 15.

Q:     What did you tell her?

A:     That Allen was doing bad things and he was a monster, and she didn't do anything at that time. She believed him.

Q:     So she asked him about it?

A:     Yes, ma'am.

Q:     And he denied it?

A:     Yes, ma'am.

Q:     And she believed him.

A:     Yes, ma'am.

In further testimony, Amber acknowledged she never explicitly told her mother that Allen was raping her, but she also indicated that Appellant never asked her what she meant by her comments about Allen being a "monster" who did "bad things." Amber's testimony also indicated that after this conversation with her mother, Appellant asked Allen about what Amber had said, and Allen denied any wrongdoing:

Q:     Did your mother know what was happening to you?

A:     Yes.

Q:     You had told her.

A:     Yes.

. . .

Q:     She believed – did she believe Allen over you?

A:     Yes.

Q:     Did she tell you that she believed Allen over you?

A:     Yes, ma'am.

One day when she was sixteen, Amber came home crying and told her mother that while she and Allen were out jogging, he slapped her and tried to pull down her pants. Allen admitted that he had done that, saying he did so because Amber was "whining" about having to go to the bathroom, but he assured Appellant that it was not sexual. Appellant admitted that she did not believe Allen when he said it was not sexual.[9] After that, Appellant gave Amber a whistle and a cell phone to use in case Allen "did something." But Amber testified that Appellant instructed her to call Appellant, rather than 911, if Allen tried to touch her again.

At some point after the jogging incident, and believing that Allen had sexual urges toward Amber as evidenced by the whistle and phone she gave Amber, Appellant left Amber at home with Allen while she went to stay in a motel overnight.[10] Amber asked to go with her mother, but

---

[9]     This admission from Appellant also came into evidence through her written statement to police investigators. In her statement, regarding the jogging incident, Appellant stated that she "did not believe" Allen when he said the incident was not sexual, but she "had no proof." Appellant further stated that in response to the incident, she gave Amber the cell phone and the whistle, but she asserted that she told Amber to call 911, rather than her, if something happened. As noted above, Amber disputed this version of events and said that Appellant instructed her not to call 911 but to call Appellant instead. Because we must defer to the jury's resolution of this conflicting testimony, I cite Amber's testimony on this matter above.

[10]    The reason for Appellant's stay in a motel is unclear from the record. Amber testified that it was because her mother was "angry" and "wanted to be by herself." Defense counsel suggested on cross-examination of Amber that Appellant went to the motel because she had a migraine.

Appellant refused. That night, Allen raped Amber. Amber testified that at the time of this incident, her mother knew what was happening:

Q:      At that time, you had already told her about the molestation, correct?

A:      Yes, ma'am.

Q:      She left you alone anyway?

A:      Yes, ma'am.

Allen continued to sexually assault Amber until Appellant witnessed an incident and could no longer maintain that she did not know about the abuse. One day in 2011, Appellant heard Amber and Allen talking in Amber's room. When she opened the door, she saw Allen with his hand on Amber's vagina. Appellant and Allen argued, and Appellant kicked Allen out of the house. Soon thereafter, Allen called Appellant begging her to allow him back home. Appellant, in turn, pressured Amber by asking her to think about her younger siblings and the fact that "they need their dad." Amber eventually acquiesced and Appellant allowed Allen to return within a mere four hours of the witnessed sexual assault.

For two weeks after Allen's return, Amber slept with her mother in the master bedroom. After that, Allen returned to the master bedroom and Amber returned to her bedroom. The only additional precaution Appellant took to protect Amber from Allen was to install a beaded curtain in front of Amber's bedroom door so that she could hear if Allen went into Amber's room.[11] Amber testified that no further assaults occurred after that point.[12] Amber moved out of the house when

---

[11]    It is unclear whether there was still a door to Amber's room in addition to the beaded curtain or whether the beaded curtain replaced the door. It is also unclear exactly when the beaded curtain was installed.

[12]    Amber testified that at one point, Allen approached her and said he could "do it again" if she wanted him to. Amber told him no.

she turned eighteen. Amber stated that when she moved out, her mother told her not to tell anybody about what Allen had done to her.

Applying "common knowledge, observation, and experience gained in ordinary affairs,"[13] a rational jury could have drawn several reasonable inferences regarding Appellant's intent to promote or assist in the offense from the "circumstantial evidence. . . . [of the] events that took place before, during, or after the commission of the offense."[14]

To start, a jury could reasonably infer that no mother with a bedroom right next to her daughter's bedroom could remain ignorant to the fact that her husband was leaving nearly every night and having sex with her daughter for two or more years, especially when it was usually "painful" and caused Amber to cry out. A jury could reasonably infer that Appellant would have heard something on many of those nights but intentionally chose not to act. A jury could also reason that it was implausible that on at least one occasion and possibly more, Appellant heard Amber cry out for her in the middle of the night, found her husband gone from the marital bed, stood outside the locked door of Amber's bedroom, merely asked, "What's going on?", and then accepted the excuse that her daughter was just having a nightmare and needed to be comforted by her stepfather when she had cried out for her mother. Rather, a rational jury could glean from these facts that Appellant was aware abuse was occurring but sought to insulate herself from the situation by avoiding learning specific details or seeing the abuse with her own eyes.

When Amber came to her mother and told her that Allen is a "monster" who "did bad things," what mother does not ask her daughter any follow-up questions? A jury could infer that the answer to that question is a mother who already knows what her daughter means but does not want to hear the words spoken out loud.

---

[13] *See Acosta*, 429 S.W.3d at 625.

[14] *Cary*, 507 S.W.3d at 758.

This is a mother who willfully ignored every obvious sign. This is a mother who admitted that she knew her husband had sexual urges towards her daughter when he slapped her and tried to pull down her pants. Yet, this mother did not ask any further questions, and she did not report anything. Instead, this mother's reaction was to give Amber a whistle and a cell phone to be used only to call her, not 911. Then, even after this incident that Appellant knew was sexual, this mother left the house and spent a night in a motel, leaving her daughter to be raped by Allen yet again.

This is also a mother who, when she finally saw the sexual assault with her own eyes and no longer had plausible deniability, did not call the police, never reported it, never asked her daughter any questions about what else may have occurred, and instead allowed Allen back in the house a mere four hours after she had asked him to leave. This mother even allowed Allen to continue living in the house with her daughter (and his young daughter) over the next two years, thereby exposing Amber (and her sister) to the possibility of more abuse. Aside from allowing Amber to sleep in her bedroom for a couple of weeks and installing the beaded curtain, Appellant took no steps to prevent further abuse of Amber by Allen. A rational jury could infer, based on these facts, that Appellant intended to keep her husband at the expense of her own daughter's safety. This was clear not only from Appellant's willful ignorance of the details of the sexual activity Appellant knew was occurring, but also from Appellant's unwillingness to take any meaningful action to protect her daughter from further sexual abuse once she saw it with her own eyes. The jury was free to consider these facts in reaching its conclusion that Appellant intentionally turned a blind eye to the details of the abuse that had already occurred, while knowing that it was in fact occurring, and failed to take any meaningful precautions to protect Amber thereby assisting Allen's commission of sexual assault against her daughter.

These inferences are not based on speculation; rather, they are based upon a common-sense view of the facts. Amber was a teenage girl, and Allen was her stepfather. There was practically no possible innocent excuse for him to be visiting her nightly in her bedroom behind a locked door

while she cried out for help. The likelihood of Appellant not seeing or hearing anything that would have alerted her to the reality that Allen was abusing Amber, during a period that spanned several years and when the abuse was occurring in a bedroom right next to hers, was exceedingly small. If the totality of these facts, coupled with Appellant's failure to take any reasonable action in response, were not enough for the jury to conclude that she was "acting with intent to promote or assist" in Allen's sexual assault of Amber, then it seems that what the Court is demanding under these circumstances is direct proof that Appellant knew about the abuse—either that she saw it with her own eyes, or that Amber specifically told her at some point that Allen was raping her. But neither our sufficiency standard nor Section 7.02(a)(3) requires this kind of direct evidence of intent.

The Court's opinion rejecting the jury's verdict deviates from sufficiency principles by failing to defer to the jury's resolution of conflicting facts, and by disallowing the jury from relying on reasonable inferences to draw conclusions about Appellant's intent surrounding her husband's sexual abuse of Amber. Applying the appropriate level of deference to the jury's verdict, there is sufficient evidence to support Appellant's conviction as a party to this offense under Penal Code Section 7.02(a)(3). Therefore, I respectfully dissent.


FILED: April 1, 2020
PUBLISH